We're back with you. Thank you. This is Kang versus Attorney General, Mr. Yam. Yes, good morning, Your Honor. My name is Man C. Yam for Petitioner Jin Yu Kang. I will reserve five minutes for rebuttal. So that I'm clear, asylum is mixed up in the briefs a bit, but asylum is not before us. Is that right? It's only the cat. That is correct. No, withholding is before us under the Act and withholding under cat is before us. That's right. Basically, what happened to Ms. Kang was she adopted a wait-and-see theory for asylum, and she didn't apply it for asylum on time. So we did not brief that issue. If you could bring the mic down a little bit and speak a little more slowly. Okay, Your Honor. Sorry about that. So the issue before us is whether Petitioner Kang qualifies for relief when she provided food and shelter for North Korean refugees. The IJA and the BIA stated that she did not because she did not have a claim that's related to an objective standard, and they didn't provide a nexus on a protected ground. However, we... Which only is good for withholding. That doesn't go to the cat relief. You don't need a nexus for the cat. That's correct, Your Honor. It is only, this only applies for withholding, withholding under the Act, not withholding under cat. But we provide, we submit that she does qualify for relief, and there is a nexus because she was exercising her political opinion while she was engaging in aiding the North Korean refugees. Yeah, I'm a bit concerned about this. There seems to be a position, and maybe I can, I will ask Mr. Inkels, I believe it is, about this. But it seems to be that she's viewed to some extent as someone who is violating the laws of her country, China, by assisting in aiding North Koreans, smuggling North Koreans into China. And therefore, since it's a law of general application, she's basically being prosecuted, not persecuted. As I read that, I became concerned because there seems to be no doubt about what happens to people from North Korea who are returned to North Korea. And if that's the case, I couldn't help but think about someone who, in Vichy, France, may have been prosecuted slash persecuted for helping people in the resistance fight against Nazi occupation. Now, that is a war that would have been of general applicability in occupied France. And you could take the position that these people are simply being prosecuted under the criminal laws of France at the time. But I would hope that we as a society would step back and say, wait a minute, the nature of what they're doing is totally consistent with political opinion persecution. Am I missing something? Is that the posture of the case before the BIA and before us? That's my posture before you and before the BIA, Your Honor. We've stated that. She basically, she did not verbally state that she has a political opinion. What she did was demonstrated her political opinion by helping these North Koreans. She provided food. She provided them a shelter. She knew it was wrong, yes, but she couldn't help herself. I mean, throughout her record, she stated it was out of compassion of why she did that. And many times, what a lot of government does is they prosecute you. They say they prosecute you, but in a sense, they're really persecuting you. Had they not, had they done that, I mean, we're not talking about where a respondent had committed an actual crime. Let's say currency violation, which the BIA pointed out. All of us know that that that is wrong. It's innately wrong. But she was aiding North Koreans. People who came here, came to China. Yes, Your Honor. Mr. Let me, did I understand you to say that we are not to be concerned with whether or not Kang has a claim for protection for so into the covenant against torture? Did you say that? No, no, no. I said that she had waived her claim for asylum because she had filed her petition. She applied for her application. Okay. Asylum. Correct. But not, not the claim for Kat. No, I haven't. We have not gotten to the Kat issue, Your Honor. She has not waived her claim. No, no, I just wanted to be sure. I misunderstood you. Maybe we can move to. But how does the evidence compel, I mean, you'll get to Kat, but how does the evidence compel the conclusion that she'll be persecuted because of a political opinion? I mean, isn't that the standard? That's a pretty high standard. What in the evidence would convince us? Well, we have the country report that was submitted the first page in the country report. Your Honor, if I may, I'll pull that out to you. Why don't you pull out the affidavits from the two compatriots of Ms. Kang as well, which are very explicit and they were in evidence and not commented on by the DIA and only inferentially by the immigration judge. That, that is correct. Your Honor. Basically, the immigration judge did not, did not really roll on those two issues. He just didn't know how to package her claim. And he even states that on the record. He said that he wished he found a straight asylum claim. And basically, her claim is new here. It's new before this court. We, it's, we can't just take a claim and package in what Congress wants us to do, whether it's political opinion, religion or a particular social. Why don't you refer to the two affidavits of Mr. Jin? The, I can't pronounce their first names, where they explicitly lay out the torture that they received in the Chinese and explicitly lay out the very things that they did, which she did. Isn't that evidence and was it considered by the BIA? You are, you are correct, Your Honor. It was not considered by the BIA at all. These, these affidavits were submitted and the BIA basically did not make a ruling on those affidavits. They only concentrated on the testimony of Pastor Kim and the country report, which they did de novo. And they should have done that, done that under the clearly erroneous standard. Now, the IJ, even the IJ doesn't outline all of these things. I mean, the IJ refers to the overall record, but clearly when it gets to the BIA, the BIA only refers to Kim and, you know, utterly fails to look at all of the things that happened that, you know, would seem to be, you don't do that unless you're intending to inflict pain and suffering, it seems. That is correct, Judge Rattle. So basically the BIA, they didn't really review any of the IJ's decision. They just agreed to what he stated and stated that she didn't have a protected ground and, which she does. So what really, I was going to ask the impact of Kaplan, our decision in Kaplan here. I mean, clearly I'm looking at page two, I guess it's appendix five, the BIA says, on appeal DHS contends that the immigration judge erred in determining it's more likely than not the respondent would be tortured. We agree, which as you said, appears to be a de novo review of what we have said needs to be something that is clearly erroneous. Is that correct? That is correct, Your Honor. The immigration judge had granted her protection under CAT and basically what the BIA did at that point was did a de novo review. They reviewed the statements by the pastor, the witness, and they reviewed only the country report and they conducted their own review and they stated that the immigration judge came to the wrong ultimate conclusion. And what were you feeling? Well, we can't order relief under the CAT. You're suggesting a remand back to the BIA to reevaluate the record and specifically consider the evidence that it did not discuss in its opinion? In its decision, not only for CAT, but withholding of removal. Why does it matter? Why? I mean, if we were to grant relief under CAT, isn't that enough? No, it's not enough, Your Honor. Because she should be granted protection under withholding under the act. They're both mandatory, though, right? I mean, it's not like asylum is discretionary. He said under the action. My judgment, that's a very good question because asylum relief is discretionary. Withholding under the asylum statute and withholding for CAT violation is not discretionary. It's mandatory. So why does it matter if we would order relief under the CAT? Doesn't that get you what you need? Not necessarily because the BIA can come back and deny relief under CAT by stating that even if she's sent back to jail in China, that the amount of, I don't want to use the word torture since it's a term of art, but the treatment that she received in jail might not amount to torture. Why not use the word torture? The evidence before the BIA, if they had considered the two gin affidavits, make out torture. Torture as it's defined in our statutes and torture as we defined it in Pierre. You're correct, Your Honor. And why can't you answer Judge Rendell's question? She said, is it compelling that we find must we find that it's compelling to reverse the determination? And that's my one question. The second question is, why can't we just order that the BIA is determined on the evidence that we have already seen that they were tortured or that she would be subject to torture and she shouldn't be entitled to the protection of CAT? What's wrong with that? Well, for one, Your Honor, I know I'm going over for a minute, but we can't trust the BIA. Well, but what Judge Garth is saying is we usually remand to the agency for the agency to do its own analysis. Correct. And perhaps if there were, you know, something here that we think they should look at again, we would do that. I think what he's saying is there is no doubt in the record, but that what was done here was amounted to torture and there is that likelihood. And we would order it on our own and just outright reverse rather than vacate and remand. So the fact that you can't trust them on the torture situation doesn't matter so much. Because you can't trust us either. Do you trust us? Of course. I guess that'll depend on how we decide. I guess you want the, now, is there, if we did find the existence of CAT, would they then be able to send her somewhere else? No, not necessarily. Basically, she could probably adjust that as either through a job or through a family member or she remarries. She could always adjust under CAT also. But this is the review in court. Basically, the BIA and the IJ didn't conduct any review. They didn't address political opinion. They just had a one-liner, persecution versus prosecution. They threw in currency violation. They didn't analyze what she did. You were going to talk about the country report and the fact that the first page makes it clear that here it would be political opinion. Correct. If I may, just for one minute, I'll read that. It's AR 505. The first page states, it's two paragraphs from the bottom. The government failed to protect refugees adequately and the forced reparations of North Koreans continue to be a grave problem. We know that. If there's no further questions, I reserve my time. Thank you. Thank you. May it please the Court. John Nichols for the United States. Your Honors, the courts have denied the petitioner for review for two primary reasons. Number one, the board applied a standard review in line with the court's mandate in Kaplan, and finding that the petitioner failed to establish that the government had a specific intent to torture her. Well, what were they thinking about? Assuming that there's no credibility issue here, given some of the testimony that is in the record through these affidavits about what's going on in the prison, what else could they be thinking when they put a plastic bag over someone's head? Or I think the testimony about people being strung by the toes. What do you think they had in mind when they did that kind of thing? The finding is that there's no specific intent, Your Honor, based on the testimony of Mr. Kim, testified at length. Well, go beyond Mr. Kim's testimony. He wasn't tortured. Go beyond him. He just had some pretty lousy confinement conditions, which apparently are pretty typical of confinement in China. I understand that concern. But there's more there, and the more the BIA seems not to have ever addressed. Well, the board does cite decisions from this court, Your Honor, Auguste and, or if I'm pronouncing that wrong, versus Ridge. But they just go, Auguste and Pierre, those cases go to the horrible conditions that everyone is subjected to that arise out of confinement. They arise, in that case, Haiti, out of the nature of the economy and the conditions, the horrible conditions for everybody in Haiti. There's no torture there. But that's not what we have here. If you just look at Kim's testimony, you could argue that. If you look beyond Kim's testimony, the record goes beyond that. Here we've got affidavits of Zhe Yun-Jin and Bai Yu-Jin, details of her testimony and the affidavit of her son. Four key pieces of evidence that don't talk about prisons. They talk about horrible, torturous acts, and there's no showing that those were considered at all. Can you show where in the BIA's analysis there's a reference to anything other than Kim? No, the board reviewed the factual determinations from the immigration judge and did not. But the immigration judge also focused on Kim, though, didn't he? Well, he said the overall record. Durling says, appendix page 13, the overall record evidence suggests that their fears of likely prospective torture through intentional infliction has merit. So it looks like the IJ looked at everything. And he granted relief. Yeah, granted relief. I can't find in the BIA's opinion that the BIA looked beyond the Kim affidavit. If you can show me that it did. Well, it says... I mean, there are references in the board decision. The record does not establish that Chinese authorities used torture as a matter of policy on page 3 of the board decision. And there is, I mean, similar references to the fact that they have considered the record, summary references. Well, why at the least should we not send it back because they just disagreed with the immigration judge as compared to say there was a clearly erroneous determination, a fact? Well, they disagreed with the immigration judge on the finding as to whether or not this was a level of torture. Well, they say, on appeal, DHS contends the immigration judge erred and determined it's more likely than not. Right. That the respondent would be tortured if returned to China. The last sentence... The last sentence of the BIA's decision says, Accordingly, we find that the respondent has failed to establish that severe instances of mistreatment found in the record are not so pervasive as to establish that a person detained in a Chinese prison will be more likely than not be subjected to torture as opposed to the other acts of punishment or treatment which do not amount to torture. Accordingly, he's not eligible for protection. I read the affidavit to say that they did everything except flay the skin off the prisoners that they had. And indeed, I'm not at all certain that they didn't. They were hung by their thumbs. They were waterboarded. They did everything in that prison that we have characterized as torture. And she was subjected to this. She would be subjected to the same thing. So where do we stand about the BIA having considered the evidence? The board said it considered the record, Your Honor. And we also look to the evidence of Mr. Kim, who said that prisoners were mistreated because they failed to adhere to prison rules. He was submitted by the petitioner as an expert on prison conditions. And regardless of why prisoners were incarcerated, all prisoners were treated the same and expected to follow the same rules. And then the board makes a very specific finding at the bottom of page two that says that there was no specific intent to torture this alien. But it starts out by saying the immigration judge relied primarily on the testimony of a witness who was in prison for four years in China. So then the BIA then proceeds to talk about Kim, but only talks about Kim. What about Mr. Jin, who says this? And I'm reading right from his affidavit. I was suspended from the ceiling, my hands tortured on the back. They used strong light to shine in my eyes. I could not open my eyes. My tears always run out of my eyes. That feeling was hard to describe. When my tiptoe was tired, my tiptoe was just able to reach the ground. I wanted to have full soul on the ground, but my tortured hands hurt very much. Chinese police still tortured my hands on the radiator and used electrical stick to touch the radiator. The electric current went through my body. I suffered pain but didn't say anything. They used a plastic bag to cover my head. I breathed very hard. Although every time is not long, about 15 minutes is the hardest time. I fainted several times. And then he goes on with other little activities that were portrayed upon him. What about all that? Are you defending that and saying that that doesn't constitute torture? There's nobody saying here specifically why he was tortured. It doesn't matter. No, that's not the question. That's not the question. The question I'm asking you, on both of them, when they talked about the activities that were taken while they were in prison, to which she may be subject. Are you telling me that that is not a torturous activity that might be visited upon her? You're familiar with the affidavits. Yes, I have the affidavit you're seeing right in front of me, Your Honor, 570 of the record. The issue is that before the board, they had both these affidavits from someone who was not actually physically present in the courtroom. And they presented an expert to expound upon these issues. No, the issue, I'm going to interrupt you again. The issue is whether or not she would be subjected to the very activities that these two individuals were subjected to. That's the issue. And if that issue is to be answered yes, then I see no basis at all for the position that you're taking. Her witness said that she would not be subjected to these. It's our position that her witness said that she would not be. Excuse me? What evidence is there that she would not be? Her witness, Mr. Kim, said that petitioners were only mistreated because they violated the prison rules. And that regardless of why prisoners were incarcerated, they were treated the same and expected to follow the same rules. The difference, though, is Mr. Kim was only testifying about generalized prison conditions. Jin and the other witness, Baio Jin and Ji Wan Jin, I guess it was, were members of her organization. Their testimony, it seems to me, can only go to what the Chinese authorities did to members of her organization. So Kim is almost a red herring here. This issue is not about what happens generally to people in prison. They eat seaweed, mixtures of seaweed, and the conditions are not good. And Auguste says that's not torture. We understand that. The issue is what happens to people who are members of her organization. Baio Jin and Quang and Jin testified about what happened to them. Judge Garza just walked you through that. It's almost stomach-turning to hear the affidavits read. Her son was tortured to find out where she was to be found. The BIA doesn't address any of that. It doesn't say we don't find it credible. It doesn't say we discount it. It doesn't say they overstated. It looks like all they looked at was Kim because the only thing that the IJ mentioned was Kim, even though the IJ said the overall record shows torture and found, in fact, that there was torture. But then the BIA says we're just going to look at Kim and the country report, and we disagree. It looks like the BIA totally ignored every other aspect of the record. Can you show me somewhere where we can tell that they looked beyond Kim and the country reports? Two pending questions. The first is that I don't think Kim's testimony is a red herring. Kim was sentenced to five years in prison for the same violation, except a little bit of a heightened level, as the petitioner. He was convicted of alien smuggling. Was that a member of her group, apparently? It's the same crime. I don't know if it is or not. It might be the same crime, but the Chinese folks apparently don't view it the same. And you yourself said, and that's why I phrased my question that way, you're the one who said he testified about prison conditions. That's why I said he's a red herring. To the extent his testimony is being considered as prison conditions, it is a red herring because prison conditions don't get you, usually, unless it's a circumstance we haven't seen yet. In this court, we have said prison conditions, be they deplorable, don't usually rise to the level of torture. You're talking about hate. But he spoke about prison conditions as somebody who was in jail for smuggling North Koreans. So it was not just general prison conditions. He's speaking about prison conditions, and he's speaking about his experience and his experience seeing other people that were in jail for the same reason. So why does the BIA just credit his testimony and not discuss the testimony of others who, more than just one person, who have had much more extreme, at least the BIA has to say, I find his compelling and the others, I discount them. Or if somehow, if they're going to reverse the IJ's finding that the overall record shows torture, you've got to tell us how the overall record does not compel. Especially since they were named in the same warrant. It seems to me that's key. The other two who were given this horrendous treatment that Judge Garth just went through were named in the same warrant as Kang. Kim was somebody who apparently wasn't even acquainted with the petitioner here and was brought in afterwards. He did not know her, was brought in as an expert witness. But the people named in the same warrant she was named in were given the kind of treatment that Judge Garth just recounted. In response to Judge Rendell's question, I'll try to answer both. In page two, the board recognizes of the board decision the immigration judge relied primarily on the testimony of a witness who was in prison for four years and the State Department country report. Recognizing that there was a primary reliance upon those two pieces of evidence. And that's why the board goes into greater detail on those. But the immigration judge said the overall record evidence more than suggests. He didn't go into chapter and verse, but considered the overall record evidence. And the BIA, while it's okay to look at what he talked about, has to look at the overall evidence. And there's no mention of anything. Mr. Kim also said, if you'll pardon me, he also said, I have been told about Mrs. Kang's asylum petition. I know that if she is returned to China, she will face extreme and harsh treatment. I don't understand your position at all, because we do not have an analysis of the matters that appear in the record. And so far as I am concerned, as I indicated before rather forcefully, I think that she should be granted her cat petition without question. Maybe we can reach an agreement here. As a representative of the United States, would you agree that if someone could show that there's a warrant outstanding for her arrest in China, that she came to the United States, that two other people named in the same warrant were subjected to the kind of treatment that Judge Garth just outlined for us? And would you then agree that if she was sent back to China, it's more likely than not being named in the same warrant as those two people, she'd be treated the same as those two people. Would you then agree that, one, if she were to go back to China, there's nothing on the record to suggest that she would be given differentiated or preferential treatment to her two colleagues named in the same warrant, or that the treatment she would receive, being treated the same as the other two, would be what we have called in the United States under our laws and what the United Nations has named under the Convention of Torture. Would you agree to those things? And if not, why? What do you disagree with? There's a lot in there, Your Honor. Well, basically, it's a summary of the questions we've been asking you, and we've been asking you as representatives of the government. I mean, I understand, and I don't want to frustrate the Court. I think the contradictory testimony in this case, especially when it's a more likely than not standard that a petitioner needs to establish torture by. What is there to suggest that the testimony of her two colleagues named in the warrant, the affidavit testimony, is not credible? No one suggested that. The IJ didn't suggest that, BIA didn't consider it. What is there to suggest that those things are inflated? Well, there's not that they're inflated, Your Honor, but then that would also say that Mr. Kim's testimony is, I mean, it's not which is wrong. It's which one does the… They didn't. Let's assume they didn't treat everybody who aided North Koreans the same. But for whatever reason, and we don't know what it is, the people in her group, they had a particular problem with. And we know for sure, given the absence of contravening, contraveiling testimony, contradictory testimony, we know for sure what happened to the only two members of her organization that we know about, and that's Yuan Jing, and I'm not pronouncing that correctly, and Bai Yu Jin. We know what happened to them in the same warrant that she was named. I'm missing something here. I'm not sure, other than adversarial zeal, I'm not sure I understand your position or your reluctance to simply concede to someone who's having a past. Your Honor, given this record, I'd have to agree that it's more likely than not that she'd be given certain treatment and she won't be returned, and I can't in good faith stand here and tell you that treatment is not a mouth of torture. To me, given the way it was taken, that would be appropriate. And add in the fact that the IJ had to, finding, with respect to that likelihood, had to be clearly erroneous. I mean, when you factor that in, I mean, it's not, you know, reasonable minds could disagree. It's a DeNovo review versus Kaplan on that. That's the ultimate finding as to whether or not that rises to DeNovo. Whether it constitutes torture? This is an issue as to the likelihood. He said, the BIA said, it's not so pervasive. It's not so bad. It's this, it's the likelihood. Will she or will she not be tortured? Will she or will she not? And the BIA said, nah, I don't think so. Not the likelihood is clearly, it's clearly erroneous that this is likely. And didn't, whether it's the, whether it satisfies torture or not, the BIA didn't really address because they would have to have looked at what Kim said and what Gene said and what, you know, prison versus, they would have had to look at whether this constitutes torture. They didn't really concern themselves with that. The board says twice on page three that they looked at the record and they reviewed the record. I think your question earlier was that they didn't do as much of a review, as in depth of a review, as the immigration judge. And I think, first off, they are reviewing court, but I think based on the fact that they reviewed the same evidence and they said the same evidence on page two and then they said, yeah, we also looked at the record on page three. But if your view is that they decided the issue of it was this torture, certainly they had to talk about the acts that Judge Garth referred to. You can't just, you know, if it was a determination that this wasn't torture, they have to somehow discount those things. They have to. And they didn't even do that. Well, we're arguing with you rather than letting you argue to us. I see my time has expired. Are there further questions? No, no. I think we're okay. Thank you. Thank you, Your Honor. I appreciate it. Mr. Yam, if you insist, absolutely insist on rebuttal time, you've reserved it, I think, and we'll hear you if you insist on doing that. I just only need... What is it with lawyers? Just to make a statement, we brought up Pastor Kang's testimony. The last three attorneys who have done what you have just done, right, presided over, said something during the course of their very unnecessary and redundant rebuttal to convince me they were absolutely wrong No, no, no, no, no. I am going to convince you that I am absolutely right. Basically, we have to understand Pastor Kim was an American citizen. He's not a Chinese citizen, so of course they're going to treat him differently. So it was apples and oranges in terms of using his... That's correct. That's exactly correct. And one other point, he stated in his testimony, and it's also in our brief, that people help North Korean refugees, they're charged as criminals, but their treatment were like murderers and traitors, not of anybody breaking a minor law. But that's all I wanted to add. I'm not sure that does help you because you're saying they're treated like common criminals, i.e., they were prosecuted. No, no, no, no. They were treated like murderers and traitors, not common criminals. That's pretty severe. So they got more severe prosecution. That's correct. Longer sentences. Yes. Basically, they were really upset with him. So they got longer sentences. Excuse me? So they got longer sentences. They were able to get longer sentences. All right. That doesn't mean they were tortured. Well, they said they were charged him as criminals. Okay. I'm done. Pastor Kim was an American citizen. He would be treated differently. Yes. Thank you, Judge Randall, Judge McKee, Judge Garth. Thank you. Thank you very much for your argument. Recess. Len, we'll give you a call from Chambers. Very well. I'm in Chambers. I'll wait for your call. All right. Great. Thank you.